J. S63045/17

NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37

IN RE:  A.E.G.G.-S., A MINOR : IN THE SUPERIOR COURT OF
  : PENNSYLVANIA

IN RE:  A.R.M.G.-S., A MINOR :

 :

APPEAL OF:  M.L.P., MOTHER : No. 764 WDA 2017


Appeal from the Decree, April 25, 2017,
in the Court of Common Pleas of Blair County
Orphans' Court Division at Nos. 2017 AD 7, No. 2017 AD 7A


BEFORE:  BOWES, J., SOLANO, J., AND FORD ELLIOTT, P.J.E.


MEMORANDUM BY FORD ELLIOTT, P.J.E.: FILED DECEMBER 19, 2017

M.L.P. ("Mother") appeals from the decrees dated and entered April 25, 2017, in the Court of Common Pleas of Blair County, granting the petition of Blair County Children Youth & Families ("BCCYF") and involuntarily terminating her parental rights to her minor, dependent children, A.E.G.G.-S., a female born in April of 2011, and A.R.M.G.-S., a male born in January of 2014 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1]  After careful review, we affirm.

---

[1] By the same decrees, the trial court additionally involuntarily terminated the parental rights of the Children's father, M.D.G. ("Father"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).  We disagree with the trial court as to the application of Section 2511(a)(5) and (8), as the Children were not removed from Father's care.  See In re C.S., 761 A.2d 1197, 1200 n.5 (Pa.Super. 2000) (en banc).  See also In re Z.P., 994 A.2d 1108, 1123 n.2 (Pa.Super. 2010).  Father has not filed an appeal, nor is Father a party to the instant appeal.

The relevant procedural and/or factual history is, in part, as follows:

6.     . . . .

   b.     Regarding custody and placement, [b]oth [A.R.M.G.-S.] and [A.E.G.G.-S.] have been removed from their parents since January 25, 2016. [A.E.G.G.-S.] was placed into foster care on that date and [A.R.M.G.-S.] was placed into foster care following his discharge from Children's Hospital [of Pittsburgh] on February 25, 2016. [A.E.G.G.-S.] has been in the pre-adoptive foster home of [J.D. and D.S.] since January 25, 2016 and [A.R.M.G.-S.] has been in the [same] pre-adoptive home since June 3, 2016.[2]

   c.     Placement of the [C]hildren was necessitated on January 25, 2016 when an open child abuse investigation was initiated due to life threatening injuries sustained by [A.R.M.G.-S.] and other bruising to [A.R.M.G.-S.]'s body and face[3] while in the care of [Mother] and her paramour, [J.M.]. Upon initial investigation by BCCYF, it was discovered that [A.E.G.G.-S.] also

---

[2] A.R.M.G.-S. was initially placed in another foster home upon release from the hospital and transitioned into the current pre-adoptive foster home with his sister. (Notes of testimony, 4/25/17 at 38-39.)

[3] Notably, A.R.M.G.-S. was diagnosed with a subdural hematoma with an 11-millimeter midline shift of the brain, a left pupil that was dilated and minimally responsive, as well as bruising to the buttocks, back, face, and legs. (Notes of testimony, 4/25/17 at 51; 2/5/16 at 6, 8-9, 26.) He required a left side craniectomy to relieve the pressure on his brain as well as an external ventricular drain. (Notes of testimony, 2/5/16 at 28-29.) Both children's injuries were deemed to be the result of physical abuse. (Id. at 11, 14, 19-20, 34, 37.)

had significant bruising to her face, head and buttocks.[4] [Mother] and [J.M.] had no plausible explanation for the injuries. During the dependency hearing held February 5, 2016, medical experts testified and the Court found that that the [C]hildren's injuries were the result of child abuse. As a result, both children were declared dependent and kept in the physical and legal custody of BCCYF. [Mother] was only allowed supervised visits and was directed to undergo a global psychological evaluation. The goal was deferred pending the outcome of the child abuse investigations and the recommended global assessment.

d.    Thereafter, with regard to Mother:

i).    Both Mother and [J.M.] were indicated as perpetrators of physical abuse on February 25, 2016 for causing bodily injury to [A.R.M.G.-S.]. [J.M.] was also indicated on February 25, 2016 for causing bodily injury to [A.E.G.G.-S.]. Both [Mother] and [J.M.] have pending felony charges against them relating to the abuse.[5]

---

[4] Some of A.E.G.G.-S.'s injuries were instead described as abrasions and/or lacerations.  (Notes of testimony, 2/5/16 at 12-13, 36-37.)

[5] Mother was charged with two counts of endangering the welfare of a child. (Notes of testimony, 4/25/17 at 52-53; 10/18/16 at 53.)

ii). Despite the findings of abuse and the pending criminal charges, [Mother] continue[d] to reside with [J.M. until November 2016], does not believe the [C]hildren were abused, and takes no accountability for the abuse.

iii). At the 3rd month interim hearing held on April 27, 2016, both Dr. O'Hara—who was performing the psychological evaluations on [Mother]—and [A.E.G.G.-S.]'s therapist testified that visitation between the children and their mother should be suspended for 2 months until the matter could be further reviewed at the 6th month permanency review. It was further noted that there had been no compliance with the permanency plan by [Mother] and no progress by [Mother] in remedying the circumstances that led to the [C]hildren's placement. As a result, the goal was continued to be deferred and [M]other's visits were suspended. [Mother] was further directed to participate in domestic violence counseling, non-offenders treatment, and individual therapy as recommended by Dr. O'Hara.

iv). At the 6th month permanency review held over two days on July 19 and October 18, 2016, the Court changed the goal for both children to adoption and made similar findings that there had been minimal compliance with the permanency plan by [Mother] and minimal progress by [Mother] in remedying the circumstances that led to the children's placement. The Court noted that, although [Mother] was participating in the domestic violence/ non-offenders treatment, she was still living with [J.M.] and criminal charges were still pending against both [Mother] and [J.M.]. Further, evidence revealed that there were three prior substantiated cases of neglect by [Mother] regarding three of her other children in California which ultimately led to those children's adoption. Dr. O'Hara's updated psychological evaluations and interactional assessments—which are incorporated herein by reference—revealed that: a) [Mother] essentially denied or minimized all of the allegations regarding CYF history with her other three children in California

and all of [A.R.M.G.-S.] and [A.E.G.G.-S.]'s injuries and assumed no responsibility for her historic circumstances and b) [Mother] was unable to demonstrate any protective capacity for her children which is necessary for the [C]hildren to build a sense of trust and safety with their mother. It was still therapeutically recommended that there be no visits between the [C]hildren and [Mother].

. . . .

f. Following completion of the 6th month permanency review on October 16, 2016, the Court directed that BCCYF proceed with a petition to terminate the parents' parental rights and directed that there be no contact with either parent unless deemed therapeutically appropriate.

g. At the 12th month permanency review hearing, the Court, once again[,] found that there had been no compliance with the permanency plan by either parent and no progress by either parent in remedying the circumstances that led to the [C]hildren's placement. [Mother] was still residing with [J.M.]. . . . Both of the children's therapists testified that the [C]hildren had been subjected to significant trauma when the family unit resided together and that the [C]hildren disclosed that their mother did not protect them. Both

therapists continued to recommend that there be no contact between the [C]hildren and their parents. The Court adopted that recommendation and maintained a goal of adoption.

. . . .

7. Both [A.R.M.G.-S.] and [A.E.G.G.-S.] remain in the [foster parents'] home which remains an adoptive resource for both children. [A.R.M.G.-S.] is receiving appropriate care in [foster parents'] home and is recovering from serious injuries. Both children show affection for the foster parents and now feel safe in the foster home and feel safe from their past experiences of abuse/neglect. Both children have been removed from their parents['] care for over a year and require permanency, safety and stability[,] which neither parent can provide. Observations by BCCYF, Dr. O'Hara and the [C]hildren's therapist[s] reveal that the [C]hildren show apprehensiveness, anxiety and a lack of security around their mother, that they do not seek their mother out for their needs and have no detrimental effects by their lack of contact with their mother. . . .

8. Further, Dr. O'Hara did an interactional evaluation with both children and [foster parents] on December 19, 2016. Dr. O'Hara noted that the foster parents displayed positive parenting skills, engaged well with both children, were closely involved with [A.R.M.G.S.]'s recovery, and were easily able to gain compliance from both children. Similarly, Dr. O'Hara observed that both children exhibited components of secure attachment with the foster parents, showed love and affection toward [foster parents] and referred to them as "Daddy." Dr. O'Hara reiterated the [C]hildren's need for permanence and safety which they had in

> [foster parents'] pre-adoptive home and which they could not gain from their parents.

Petition to Terminate Parental Rights, 2/22/17 at ¶¶6, 8. See also Permanency Review Orders, 5/3/17, 1/18/17, 10/26/16, 5/9/16; Order of Adjudication and Disposition – Child Dependent, 2/17/17; Order for Emergency Protective Custody, 1/26/16.

On February 22, 2017, BCCYF filed petitions to involuntarily terminate parental rights. Thereafter, the trial court conducted a combined termination and permanency review hearing on April 25, 2017. In support of its petitions, BCCYF presented the testimony of Dr. Terry O'Hara, licensed psychologist, stipulated by counsel as an expert in forensic psychology;[6] Heather Attia, licensed professional counselor, Blair Family Solutions; Alison Seltzer, licensed professional counselor, Blair Family Solutions;[7] J.D., foster father; and Ronna Holliday, BCCYF caseworker. Mother, who was present and represented by counsel, testified on her own behalf and presented the testimony of her former paramour, J.M.'s mother, A.M. Father, who participated via telephone from California and was represented

---

[6] Dr. O'Hara conducted a global assessment of Mother, as well as interactional evaluations of Mother and the Children and foster parents and the Children, and individual evaluations of Mother and A.E.G.G.-S. His most recent report, dated December 19, 2016, was admitted on April 25, 2017, as Petitioner's Exhibit 1. (Notes of testimony, 4/25/17 at 11.)

[7] Ms. Attia provided therapy to A.E.G.G.-S., and Ms. Seltzer provided therapy to A.R.M.G.-S.

by counsel, did not present any evidence.[8, 9]  Counsel stipulated that "if called to testify, [BCCYF] witnesses would testify consistent with the facts set forth in the fifteen month interim permanency review petition without admitting to the veracity or the facts therein."  (Notes of testimony, 4/25/17 at 3.)

By decrees dated and entered April 25, 2017, the trial court involuntarily terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[10]  On May 25, 2017, Mother filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[11]

---

[8] Counsel for Father indicated that Father was not contesting termination, stating, "Your Honor, our position would be that while we're not voluntarily consenting to a termination, we have chosen not to contest it.  We're satisfied that the [C]hildren are in an excellent home. . . ."  (Notes of testimony, 4/25/17 at 92.)

[9] The guardian ad litem ("GAL"), Aimee Willett, Esq., also participated in the proceeding.  Ms. Willett argued and the court accepted her position to represent both the Children's legal and best interests.  (Notes of testimony, 4/25/17 at 93-95.)  Notably, Ms. Willett asserted a lack of conflict between the Children's legal and best interests.  (Id. at 93.)  At the close of the hearing, Ms. Willett argued in favor of termination of Mother's parental rights.  (Id. at 93-94.)

[10] The trial court announced its decision, memorialized by subsequent decrees, on the record on April 25, 2017.  (Notes of testimony, 4/25/17 at 96-97.)

[11] The trial court entered separate decrees terminating parental rights to each of the Children.  Mother improperly filed only one notice of appeal and one concise statement of errors complained of on appeal from the decrees.  See Pa.R.A.P. 341, Note ("Where, however, one or more orders resolves [sic] issues arising on more than one docket or relating to more

On appeal, Mother raises the following issues for our review:

1.      Whether the Court erred in determining the evidence supported by clear and convincing evidence that Mother's parental rights should be terminated[?]

2.      Whether the Court erred in determining Mother evidenced a settled purpose of relinquishing her parental rights as she never refused or failed to perform her parental duties on her own accord[?]

3.      Whether the Court erred in determining Mother[] abused, neglected or refused to provide her child[ren] the essential parental care, control or substance necessary for the [C]hild[ren]'s physical or mental well-being[?]

4.      Whether the Court erred in determining Mother could not, or would not, remedy the conditions or causes of the alleged incapacity or neglect[?]

5.      Whether the Court erred in determining Mother could not remedy the circumstances that led to the removal of the [C]hildren, as she was never given a fair opportunity to do so because of Children, Youth and Families['] directives[?]

6.      Whether [t]he Court erred in determining the termination of Mother's parental rights would best serve the development, physical and emotional needs and welfare of the [C]hild[ren][?]

---

than one judgment, separate notices of appeal must be filed."). Because Mother's arguments on appeal are identical as to the Children, we discern no prejudice arising from her procedural misstep. Therefore, we decline to quash or dismiss Mother's appeal.

Mother's brief at 4-5.[12]

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., 9 A.3d [1179, 1190 (Pa. 2010)].

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."

---

[12] We observe that, while Mother seemingly challenges termination pursuant to Subsection (a)(1) with her second issue, as is suggestive by her language, BCCYF did not petition and the trial court did not terminate Mother's parental rights under this subsection. Further, Mother failed to preserve a challenge related to Subsection (a)(8) by failing to present specific and distinct argument related thereto in her brief. As such, we find that Mother has waived such claim. In re W.H., 25 A.3d 330, 339 n.3 (Pa.Super. 2011), appeal denied, 24 A.3d 364 (Pa. 2011), quoting In re A.C., 991 A.2d 884, 897 (Pa.Super. 2010) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

In re M.G., 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." In re Adoption of T.B.B., 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re C.S., 761 A.2d at 1201, quoting Matter of Adoption of

Charles E.D.M., II, 708 A.2d 88, 91 (Pa. 1998). In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). See In re B.L.W., 843 A.2d 380, 384 (Pa.Super. 2004) (en banc). Here, we analyze the court's termination decree pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition

> filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected

as untimely or disingenuous." In re A.L.D., 797 A.2d at 340 (internal quotation marks and citations omitted).

Instantly, in finding grounds for termination pursuant to Section 2511(a)(2), the trial court concluded that BCCYF presented clear and convincing evidence. (Trial court opinion, 6/6/17 at 16.) The court stated as follows:

> As we stated at the conclusion of the combined 15th month permanency review hearing/TPR [(termination of parental rights)] hearing, we place significant weight on the testimony of the professionals in this case, including but not limited to Dr. O'Hara, Ms. Attia, Ms. Selzter, and the prior medical testimony of John A. Baker, M.D. and Jennifer Wolford, M.D., as outlined in the Order of Adjudication and Disposition – Child Dependent dated 2/8/16 and the prior Permanency Review Orders. The mother has, unfortunately, demonstrated a pattern of engaging in relationships with men who are physically and emotionally abusive toward her and her children. The mother has not demonstrated an ability to protect her children. The fact that she remained with [J.M.] for approximately ten months after the subject incident of 1/25/16, when A.R.M.G.-S. sustained her life-threatening injuries at the hands of [J.M.], defies her testimony that she would choose her children over anyone. Further, the mother fails to acknowledge that A.R.M.G.-S.'s injuries were the result of intentional conduct. Without such acknowledgement and recognition, and without the mother engaging in intensive non-offender treatment and counseling necessary, there is no potential for the mother to remedy the circumstances that led to placement. . . .
>
> The [C]hildren were removed from [] Mother's care on January 25, 2016. At the time of the TPR hearing held April 25, 2017, they had been removed from [] Mother's care for more than 12 months and the

> conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by [] Mother. Further, the conditions which led to removal and placement continue to exist and [] Mother cannot or will not remedy those conditions within a reasonable period of time, no matter what additional services may be provided. BCCYF has met, by clear and convincing evidence, the statutory grounds set forth in 23 Pa.[C.S.A. §] 2511(a)(2), (a)(5) and (a)(8)[,] and termination of the parental rights would best serve the needs and welfare of the [C]hildren.

Id. at 15-16. In addition, and significantly, the court found that Mother's testimony was "self-serving" and "not credible." (Id. at 14.)

Mother, however, argues that the court erred in determining that the evidence supported that she abused, neglected, or refused to provide the Children the essential parental care, control, or subsistence necessary for the Children's physical or mental well-being. (Mother's brief at 11.) Mother asserts that she fled an abusive relationship with the Children's father in California and was able to care for the Children for an extended period of time without intervention. She highlights Dr. Baker's positive assessment of A.E.G.G.-S. and Dr. O'Hara's description of the interaction between her and the Children as positive. (Id.) Mother states, "Her daughter A.E.G.G.[-]S. was described as very happy and pleasant by Dr. Baker who first evaluated her. The interaction between [M]other and her children was described as positive by Dr. O['H]ara[,] with mom appropriately praising them, joking, reading with them and having a playful presence with them." (Id.) Mother

- 16 -

places the blame and responsibility for the abuse in question on J.M. and maintains that she lacked the financial resources for independence. (Id.)

Mother further argues that the court erred in determining that she could not remedy the circumstances that led to removal of the Children.[13] (Id. at 13.) Mother asserts that she was never provided the chance to do so. She indicates efforts she made on her own for which she was not given credit. (Id.)

> Mother alleges that she was not given a fair opportunity to remedy the circumstances that lead [sic] to the [C]hildren's removal. In fact, [M]other did everything possible on her own to be available for the return of her children. Mother's only support was [J.M.] and [his] family. She has no family or friends in Pennsylvania and had to try to pick up her pieces on her own.
>
> Mother sought out on her own the abuse counselor, Melanie Thompson[,] and has continued to meet with [her] on a regular basis. Neither the court [n]or [BCCYF] ever gave [M]other the benefit of the doubt that she had placed or was placing her in a position which remedied the circumstances that lead [sic] to the [C]hildren's removal.

Id. We disagree.

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2). The record reveals that Mother failed to take responsibility for and appreciate the reasons the

---

[13] While Mother raises and addresses this claim separately from Subsection (a)(2), given the interrelation, we address the two issues together.

Children came into care and lacked a protective capacity, which persisted. (Notes of testimony, 4/25/17 at 8-9, 54-55.) As we discern no abuse of discretion or error of law, we do not disturb the court's findings. Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental control or subsistence necessary for their physical and mental well-being. See In re Adoption of M.E.P., 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. See id.

To the extent that Mother argues that she was not given a fair opportunity to remedy the circumstances leading to removal of the Children, which we equate to maintaining a lack of reasonable efforts on the part of BCCYF, this argument is without merit. When reviewing a termination decree on appeal, we do not consider whether BCCYF made reasonable efforts. Our supreme court has rejected the argument that the provision of reasonable efforts by the county children's services agency is a factor in termination of the parental rights of a parent to a child. See In the Interest of: D.C.D., 105 A.3d 662, 673-674, 676 (Pa. 2014) (rejecting the suggestion that an agency must provide reasonable efforts to enable a parent to reunify with a child prior to the termination of parental rights, and rejecting the suggestion that Section 2511 of the Adoption Act should be read in conjunction with Section 6351 of the Juvenile Act, particularly Section 6351(f)(9)(iii)).

As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b). In re B.L.W., 843 A.2d at 384. We, therefore, need not address any further subsection of Section 2511(a) and turn to whether termination was proper under Section 2511(b).

As to Section 2511(b), our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa.Super. 2012). In In re E.M., 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. In re K.M., 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

In re T.S.M., 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." In re K.Z.S., 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony.  Social workers and caseworkers can offer evaluations as well.  Additionally, Section 2511(b) does not require a formal bonding evaluation."  In re Z.P., 994 A.2d at 1121 (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

In re Adoption of C.D.R., 111 A.3d at 1219, quoting In re N.A.M., 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents."  T.S.M., supra at 268.  The court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind."  Id. at 269.  The T.S.M. court observed, "[c]hildren are young for a scant number of years, and we have

an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." Id.

In determining that termination of Mother's parental rights favored the Children's needs and welfare, the court reasoned as follows:

> The [C]hildren are doing very well in their foster placement, have made significant progress in their individual therapy, and are in a safe, stable and secure setting with foster parents with whom they have a strong and loving bond and who are a permanent adoptive resource. We would further note that the [C]hildren's GAL supports BCCYF's TPR petition and the proposed adoption by the foster parents.

Trial court opinion, 6/6/17 at 15.

Mother, however, contends that the court discounted evidence as to the relationship between her and the Children. (Mother's brief at 13-14.) "Mother argues the [C]hildren have always had a close relationship and they are bonded to each other. She believes the [C]hildren would be best served by being raised by her the biological parent. She has at times and can in the future meet their developmental, physical and emotional needs." (Id. at 14.)

Upon review, we again discern no abuse of discretion. The record supports the trial court's finding that the Children's developmental, physical, and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of the Children's needs and welfare,

and as to the existence of a bond between Mother and the Children that, if severed, would not have a detrimental impact on them. Thus, as confirmed by the record, termination of Mother's parental rights serves the Children's developmental, physical, and emotional needs and welfare and was proper pursuant to Section 2511(b). While Mother may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. In re Z.P., 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." Id. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decrees affirmed.

J. S63045/17

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/19/2017